# UNITED STATES DISTRICT COURT

# FOR THE MIDDLE DISTRICT OF FLORIDA

# TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*EX REL.* [UNDER SEAL]<br><br>  AND<br><br>STATE OF FLORIDA<br>*EX REL.* [UNDER SEAL]<br><br>  PLAINTIFF,<br><br>  v.<br><br>[UNDER SEAL],<br><br>  DEFENDANTS. | CASE NO. 8:18-cv-01928-T-17-SPF<br><br>COMPLAINT FOR VIOLATION<br>OF FEDERAL AND STATE FALSE<br>CLAIMS ACTS<br><br>JURY TRIAL DEMANDED<br><br>**FILED IN CAMERA & UNDER<br>SEAL<br>(AS REQUIRED BY 31 U.S.C. §<br>3730(b)(2))** |



CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA FLORIDA
2018 AUG -6  AM 11: 50
FILED

TPA052267
$400.00

1

S-1

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*EX REL.* DR. SANTOSH POTDAR, | ) ) ) | CASE NO. |
| AND , | ) ) | |
| STATE OF FLORIDA<br>*EX REL.* DR. SANTOSH POTDAR | ) ) ) | COMPLAINT FOR VIOLATION<br>OF FEDERAL AND STATE FALSE<br>CLAIMS ACTS |
| PLAINTIFF, | ) ) | JURY TRIAL DEMANDED |
| v. | ) ) | **FILED IN CAMERA & UNDER<br>SEAL** |
| HCA HEALTHCARE, INC.; HCA HEALTH<br>SERVICES OF FLORIDA, INC.; ACCESS<br>HEALTH CARE, LLC; HCA-ACCESS<br>HEALTHCARE HOLDINGS, LLC; HCA-<br>ACCESS HEALTHCARE PARTNER, INC.;<br>ACCESS 2 HEALTH CARE PHYSICIANS,<br>LLC; ACCESS HEALTH CARE PHYSICIANS,<br>LLC; ACCESS MANAGEMENT CO., LLC;<br>OAK HILL HOSPITAL; AND PARIKSITH<br>SINGH, | ) ) ) ) ) ) ) ) ) ) ) | **(AS REQUIRED BY 31 U.S.C. §<br>3730(b)(2))** |
| DEFENDANTS. | ) ) | |

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA FLORIDA

2018 AUG -6  AM 11: 50

FILED

## COMPLAINT

1.      Plaintiff-Relator Dr. Santosh Potdar brings this action on behalf of the United

States and the State of Florida against HCA Healthcare, Inc.; HCA Health Services of Florida,

Inc.; Access Health Care, LLC; HCA-Access Healthcare Holdings, LLC; HCA-Access

Healthcare Partner, Inc.; Access 2 Health Care Physicians, LLC; Access Health Care Physicians,

LLC; Access Management Co., LLC.; Oak Hill Hospital; and Dr. Pariksith Singh (collectively,

"Defendants"), under the Federal False Claims Act, 31 U.S.C. §§ 3729–33 (the "FCA"), and the Florida False Claims Act, Fla. Stat. §§ 68.081–.092 (the "FFCA"), and alleges the following on his personal knowledge, first-hand experience, information, and belief:

## INTRODUCTION

2. This case is about the efforts of Dr. Pariksith Singh -- in his personal capacity as a treating physician and through his ownership or other financial interest in the Defendant healthcare businesses -- to extract from the Medicare and Medicaid programs millions of dollars through a complex scheme of inadequate care, illegal kickbacks, and self-dealing.

3. This scheme involves three principal components. First, Dr. Singh and a group of physicians he controls unlawfully profit from the Medicare Advantage program by failing to provide necessary but expensive patient care. Dr. Singh insists on compromising patient health and wellbeing because doing so maximizes the revenues he and his companies retain from the Medicare Advantage program, which pays a predetermined, capitated monthly payment for these patients.

4. Second, Dr. Singh and the physicians he controls further profits from this harmful approach to patient care by limiting patient referrals to specialists who agree to minimize or deny medically necessary but costly care to these referred patients. Specialists comply with the scheme in exchange for continued referrals from Singh and his physicians.

5. Third, Dr. Singh insists that these specialists and other Access Defendant providers exclusively refer laboratory, rehabilitation, and diagnostic services to facilities in which Dr. Singh has a financial interest.

6. As a result of this scheme, Dr. Singh and the other Defendants have fraudulently retained tens, if not hundreds, of millions of dollars to which they were not entitled. Worse, they

have failed to provide critical care the government paid them to provide to thousands of Medicare Advantage patients.  Most of these patients are vulnerable seniors whose care and wellbeing depend on Dr. Singh and the healthcare providers and businesses he owns or otherwise controls.

7.      Relator brings this action to stop this fraudulent scheme and to recover on behalf of the government the millions of dollars it has paid for care not provided or otherwise tainted through perverse financial incentives and prohibited self-dealing.

## PARTIES

8.      Plaintiff-Relator Dr. Santosh Potdar is a resident of Brooksville, Florida.  He is an experienced, board-certified surgeon and Fellow of the American College of Surgeons who has practiced general surgery, including complex surgical procedures and organ transplants, in the United States for roughly twenty years.  Beginning in 2000, Relator worked as a general surgeon, with a specialty in transplant surgery, in various hospitals in Pennsylvania and Ohio.  In July 2013, Relator was hired as a senior general surgeon at Defendant Oak Hill Hospital in Brooksville, Florida.  Oak Hill is owned by Defendant HCA Healthcare, Inc.  In addition to his surgical duties, Relator also served as Oak Hill's Cancer Liaison Physician.  In this role, he oversaw quality improvement initiatives in Oak Hill's cancer program.  From roughly August 2016 through July 2017, Relator treated patients at Oak Hill as a contracted specialist surgeon for Defendant Access Healthcare Physicians LLC.  Relator has since continued to perform surgeries at Oak Hill as an employee of Lutz Surgical Partners.  Since 2016, Relator has served as Chairman of Oak Hill's Department of Surgery, a position to which he was elected by his peers. As Chairman, Relator sits on the hospital's Medical Executive Committee (MEC), oversees the Quality Assurance (QA) program, and regularly attends surgery department meetings.

9.      Defendant Dr. Pariksith Singh is an internal medicine physician in Spring Hill, Florida.  In 2001, Dr. Singh founded Access Health Care, LLC, a multi-million-dollar, multi-specialty group practice headquartered in Spring Hill, Florida.  According to Access marketing materials, Dr. Singh has "been [the company's] fearless leader ever since."  Through Access Health Care subsidiaries and affiliated companies -- including Defendants Access 2 Health Care Physicians, LLC, Access Health Care Physicians, LLC, Access Management Co., LLC, HCA-Access Healthcare Holdings, LLC, and HCA-Access Healthcare Partner, Inc. (collectively, the "Access Defendants" or "Access") -- Dr. Singh owns, operates, and/or has a significant financial interest in medical practices and healthcare companies throughout Spring Hill, Brooksville, and the surrounding area including Hernando, Pasco, and Citrus counties.

10.     Defendant HCA Healthcare, Inc. (formerly HCA Holdings, Inc.) is a holding company headquartered in Nashville, Tennessee.  It conducts its operations through various direct and indirect subsidiaries, partnerships, and joint ventures including hospitals, urgent care facilities, diagnostic and imaging centers, radiation and oncology therapy centers, rehabilitation and therapy centers, physician practices, and other healthcare services facilities providing inpatient and outpatient care in various states and the United Kingdom.  HCA facilities include more than 170 hospitals, including Oak Hill Hospital, and roughly 120 freestanding surgery centers.

11.     Defendant Oak Hill Hospital ("Oak Hill") is a full-service, 280-bed general acute care hospital facility which describes itself as the "largest hospital in the county" and the "area's largest private employer with more than 1,211 associates."  Oak Hill is owned by Defendant HCA Healthcare and operated by Defendant HCA Health Services of Florida.  Oak Hill is registered with Medicare as an acute care hospital under Provider ID 100264.  Oak Hill is staffed

in part by Access-employed hospitalists, as well as hospitalists employed by Dallas, Texas-headquartered EmCare.  A large number of Access-contracted specialists have privileges at Oak Hill that allow them to treat existing Oak Hill patients and to admit new patients to the hospital.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

13.     This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over the Relator's state law claims, as those claims and the Relator's federal law claims are sufficiently related to form part of the same case or controversy under Article III of the United States Constitution.  This Court has supplemental jurisdiction over the State of Florida's claims pursuant to 31 U.S.C. § 3732(b), as the State of Florida's claims arise from the same transactions and occurrences as the federal action.

14.     This Court has personal jurisdiction over the Defendants, pursuant to 31 U.S.C. § 3732(a), as one or more Defendants can be found in, reside in, transact business in, and have committed acts related to the allegations in this Complaint in the Middle District of Florida. Defendants are either Florida Limited Liability Companies, have their principal places of business in the Middle District of Florida, or -- through subsidiaries, joint ventures, partnerships, or affiliates -- conduct business in the Middle District of Florida.  Defendant Dr. Singh is a Florida resident.

15.     Venue is proper pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)–(c) because the Defendants can be found in, reside in, and/or transact business in the Middle District

of Florida, and because many of the violations of 31 U.S.C. § 3729 discussed herein occurred in this judicial district.

<b>REGULATORY BACKGROUND</b>

**I.       The Medicare Program**

16.       Medicare is a federally-funded health insurance program for the elderly and disabled administered by the Centers for Medicare & Medicaid Services (CMS).  Initially created in Title XVIII of the Social Security Act of 1965, Medicare now has four Parts: Parts A through D.

17.       Medicare Parts A and B are collectively referred to as "traditional" or "fee-for-service" Medicare.  Part A of the Medicare statute covers medical services furnished by hospitals -- and other institutional care providers -- such as inpatient hospital care, skilled nursing facility care, home health agency care, and hospice care.  Medicare Part B provides supplemental coverage of medical items and services not covered under Part A, including outpatient physician services performed in both hospital and nonhospital settings; radiology services; and clinical diagnostic laboratory tests.

18.       Under Part A, Medicare reimburses hospitals for inpatient services based on prospectively determined rates applied to each patient upon discharge.  Reimbursement under Medicare Part B -- for both physician-provided medical services and other covered services -- depends only on the services (or durable goods) provided and is generally made in accordance with fee schedules that limit the amount providers may charge.

19.       Medicare Part C generally provides the same benefits as those covered under Parts A and B but does so under a managed care model administered through private health insurers ("Medicare Advantage" or "MA" insurers).  Rather than pay providers directly based on

the medical services provided, Medicare Part C pays managed care plans a pre-determined monthly capitated rate for each covered beneficiary, and tasks the MA plan with paying providers for services rendered to members of that specific MA plan. This per member, per month ("PMPM") capitated payment is based in part on the demographic characteristics and health status of the covered beneficiary. To ensure their financial incentives are aligned and their healthcare costs optimized, MA Insurers often reimburse their contracted providers -- such as the Access Defendants -- on this same kind of pre-determined, capitated, or similarly incentivized basis.

20.     Because Part C payment does not depend on medical services actually provided but is instead based on the expected cost of providing Medicare benefits to a given beneficiary, MA insurers and their incentivized healthcare providers are generally paid more for providing benefits to older and sicker people and less for younger and healthier beneficiaries. At the same time, MA insurers and their incentivized providers stand to lose money if their patients require more costly services than the PMPM payment, because CMS pays only the PMPM rate regardless of the actual cost of the services provided. Conversely, MA insurers and incentivized providers stand to gain if their patients are provided fewer services and/or less costly care, because it maximizes the difference between the PMPM payment and the costs incurred.

## II.     The Federal Anti-Kickback Statute

21.     The Anti-Kickback Statute (AKS) prohibits the payment of any remuneration (money, gifts, or consideration of any kind) to induce the purchase or referral of healthcare goods or services for which payment may be made in whole or part under a Federal health care program. 42 U.S.C. § 1320a-7b(b)(2). The statute is designed to prevent abuses that may occur when financial incentives improperly influence health care decision-making, such as patient

referrals or course of treatment.  In enacting the statute, Congress was concerned that giving anything of value to someone with the power to influence health care decisions would result in the provision of health care goods and services that are medically unnecessary, inappropriate, of poor quality, or even harmful.

22.     Because of the severity of these potential harms -- as well as the difficulty in detecting and deterring them -- the prohibition against kickbacks is broad.  "Remuneration" encompasses any provision (or receipt) or offer (or solicitation) of anything of value, in any form.  A person violates the AKS if even one purpose of the remuneration is to induce referrals, and even if there is no knowledge of the AKS or any intent to violate it.  42 U.S.C. § 1320a-7b(h).  Although significant patient harm is at issue here, no actual patient harm need be shown to establish an AKS violation.

23.     All claims resulting from illegal kickbacks are automatically considered false claims under the False Claims Act.  Additionally, compliance with the AKS is a condition of payment under the federal healthcare programs.  Violating the AKS can also result in exclusion from participation in federal healthcare programs, civil monetary penalties, and imprisonment of up to five years for each violation.  42 U.S.C.§§ 1320a-7(b)(7), 1320a-7(a)(7).

**III.    The Stark Law**

24.     The Physician Self-Referral Law, 42 U.S.C. § 1395nn *et seq.*, commonly referred to as the Stark Law, is designed to ensure that physicians refer patients for ancillary services only when they are medically necessary and in the individual patient's best interest.  The law targets improper financial incentives that may arise from physician referrals to health care entities in which they have a financial interest.

25.     The Stark Law prohibits a physician from making referrals for designated health services ("DHS") payable by Medicare or Medicaid to an entity with which he or she has a financial relationship. 42 U.S.C. § 1395nn(a)(1).  The law likewise prohibits the financially affiliated provider from billing Medicare or Medicaid for any DHS stemming from a prohibited referral. *Id.*; 42 U.S.C. §§ 1395nn(g)(1); 1396b(s).

26.     The Stark Law's referral and billing prohibitions apply only to enumerated DHS. As relevant to this Complaint, DHS is defined to include clinical laboratory services, outpatient rehabilitation services, and radiology and certain other imaging services, all of which are further defined by a list of Current Procedural Terminology ("CPT") / Healthcare Common Procedure Coding System ("HCPS") codes CMS posts publicly and updates annually.  42 CFR § 411.351.

## ALLEGED MISCONDUCT

27.     Defendants have engaged in three principal types of misconduct.  First, Defendants have withheld from their patients necessary medical treatment to optimize their Medicare Part C profits.  Second, they have devised and orchestrated an illegal kickback scheme under which they condition patient referrals to specialists on the specialists' cooperation in further maximizing Defendants' retention of Part C payments by similarly denying necessary patient care.  Third, Defendants have engaged in improper self-dealing by requiring that these specialists and other Access Defendant providers exclusively refer laboratory, rehabilitation, and diagnostic services to Defendants' financially affiliated entities.

28.     In short, Dr. Singh and his affiliated Defendants have built a local healthcare empire in Hernando and the surrounding counties under the guise of coordinating efficient and comprehensive patient care.  At bottom, however, they have implemented a plan to elevate profit

over patient care and choice, the exact harm the False Claims Act, AKS and Stark Law were created to deter.

**I.      Defendants Improperly Deny Patient Care and Incentivize Unlawful Cost Cutting Through Prohibited Referrals**

29.      Dr. Singh and the other Access primary care physicians (PCPs) are compensated for their Medicare Part C patients based on the PMPM capitated payments Medicare makes to the patients' MA insurers.  This means PCPs make more money when their Part C patients are provided fewer services.

30.      Defendants refer their patients to specialists through Access-employed PCPs and Access hospitalists practicing at Oak Hill Hospital.  Access PCPs, on the one hand, are the gatekeepers of all aspects of outpatient care and, as such, are responsible for authorizing referrals even when the underlying request originates from an encounter with a specialist.  Access hospitalists, on the other hand, are responsible for overseeing and providing inpatient care at Oak Hill, including referrals to specialists.  These PCPs and hospitalists work under the close watch and control of Dr. Singh and his second-in-command, Mirza Baig, Access Healthcare's Vice President of Business Development.

31.      Dr. Singh and his physicians take advantage of the Part C capitated payment structure by choosing the least costly treatment options regardless of patient need, and by referring their patients only to specialists who agree to do the same.  The resulting cost savings routinely come at the expense of patient wellbeing.

32.      Specialists are financially motivated to abide by this profit-driven approach to patient care to protect their steady stream of referrals from Dr. Singh and the Access PCPs.  To further protect referral streams, some specialists also agree to refer patients to Dr. Singh and the PCPs he controls, who profit from these referrals by enrolling these patients in Medicare

11

Advantage.  These types of *quid pro quo* arrangements are precisely the type of illegal kickbacks the AKS is designed to target.

33.    Relator -- through his work as an Access-employed specialist and as an independent surgeon, his role as chief of surgery at Defendant HCA-owned Oakhill Hospital, and his conversations with other Access-employed and independent specialists at Oakhill -- has witnessed this fraud and kickback scheme first-hand.  He is aware of numerous instances in which Dr. Singh and the PCPs, hospitalists, and specialists he controls improperly cut costs by denying patients medically necessary treatment, including hospital admissions, surgeries, and advanced diagnostics.  He is also aware of instances in which Dr. Singh has challenged or overruled treatment decisions based on cost, rather than on patient need.  Some of these instances involved patients Relator personally treated.  Relator is likewise aware of specialists mechanically referring their patients back to Dr. Singh and the physicians he controls solely to maintain their referral relationship with Dr. Singh and these physicians.

34.    In Relator's experience, the most common conditions for which Defendants have employed their scheme of providing or incentivizing substandard or nonexistent care include intestinal blockages and diverticulosis, various cancers, and certain heart conditions.

35.    Relator is personally aware or learned first-hand through his colleagues of numerous examples in which Dr. Singh and those under his control discouraged, vetoed, or failed to provide necessary, but expensive patient care, or otherwise disregarded patient need in favor of profit.  These include:

- Access PCPs persuading cancer patients to forgo chemotherapy treatment even in the face of countervailing recommendations from independent oncologists.

- Cardiologists counseling their patients with serious heart valve issues to forgo necessary heart surgery, instead convincing them to rely on medication alone.

12

- Access PCPs ignoring recommendations from breast cancer specialists for less invasive and more accurate diagnostic testing -- such as MRIs, genetic testing, or stereotactic biopsy -- instead pursuing cheaper, cruder open biopsies instead.

- Access PCPs referring patients with pancreatic cancer -- a condition that generally entails long hospital stays and can be very costly to treat -- to hospice rather than to tertiary treatment centers.

- Access PCPs counseling diverticulosis patients to avoid colostomy reversal -- a common, generally low-risk surgery typically performed three to four months after the initial colostomy placement -- instead convincing them to keep their colostomies in place for years. Relator has seen several patients in the past year alone who told him they avoided surgery on the advice of their Access PCPs, only opting for the reversal on the advice of acquaintances who had been through the procedure successfully.

36.     For many Access patients who, because of their health conditions, are no longer profitable to Defendants, Dr. Singh and his physicians simply recommend premature referral to hospice. They do so by falsely certifying these patients as terminally ill, i.e. having a life expectancy of six months or less, when in fact they could live well beyond that with the treatment Dr. Singh and his physicians refuse to provide.

37.     A small team of Access hospitalists, controlled by Dr. Singh and his lead hospitalist Dr. Yuliya Markova-Acevedo, are involved in the end-of-life decision making process for patients at Oak Hill, including Relator's surgical patients. The decision-making process, by and large, is closed: attending surgeons, specialists, and treating physicians, who are typically in the best position to evaluate individual patient needs, are almost entirely shut out. Non-Access hospitalists practicing at Oak Hill are likewise excluded from the process.

38.     Relator was shocked to discover this hasty, seemingly *ad hoc* approach to hospice transfer recommendations. In two and a half decades of practicing medicine prior to moving to Florida, Relator had never encountered such a cavalier attitude toward the end-of-life decision-

13

making process.  It is difficult to imagine a more crucial decision than choosing to forgo curative or life-extending treatment, but Dr. Singh's and his team at Access refer patients based on the most minimal evaluation.

39.    As just one example, one of Relator's surgery patients in his mid-seventies was admitted to Oak Hill in early 2018 with sepsis resulting from the collection of fluid in his pelvic cavity.  In consultation with Relator, the radiologist placed a pelvic drain and started the patient on a course of antibiotics, ultimately resolving the sepsis.  Nevertheless, the Access infectious disease physician treating the patient for urological concerns recommended him for hospice.

40.    In another example, a male patient in his mid-sixties was admitted to Oak Hill for rectal bleeding and diagnosed with rectal carcinoma.  Rectal carcinoma is a treatable and, depending on stage, curable cancer.  However, rather than treat the disease, the Access hospitalist automatically referred the patient to hospice.  Fortunately for the patient, his son intervened and took him to an independent oncologist, who has since implemented a course of treatment.

41.    In countless other instances, the patients were not so fortunate.  Dr. Singh and his physicians have repeatedly referred their patients to hospice when there were available courses of treatment they chose not to provide because of cost.  Given the vulnerability of their target population, Defendants accomplish many transfers to hospice with little patient resistance.

42.    Dr. Singh, Dr. Markova-Acevedo, and their Access hospitalists have on numerous occasions shut Relator out of end-of-life decisions for patients for whom he acted as the primary or consulting surgeon.  In those rare instances in which Access physicians contacted Relator prior to withdrawing care for his patients, they did not genuinely seek Relator's medical assessment of whether hospice was appropriate.  Rather, they contacted Relator to strongarm him

14

into agreeing to withdraw patient support.  On one occasion, for example, Dr. Singh pressured Relator to consent to transfer one of his surgical patients to hospice.  The surgery had been a simple intestinal obstruction reversal, and the patient was recovering within expected parameters. Relator refused to consent to the transfer.

43.     Relator has heard similar complaints from his colleagues at Oak Hill.  As chief of surgery, Relator has learned of numerous instances in which Access hospitalists bypassed attending surgeons to recommend withdrawal of care and transfer to hospice.  For example, two Oak Hill surgeons complained to Relator that Access hospitalists made unilateral decisions to send to hospice patients on whom they had performed surgeries.

44.     Relator, a frequent participant in Oak Hill Department of Surgery meetings, has repeatedly voiced concerns about Access hospitalists' inappropriate approach to end-of-life decision-making at these meetings.  The core of his concerns is that Access hospitalists making these critical care decisions lack the full picture of the patient's health and are ill-equipped to unilaterally determine the patients' suitability for hospice.  At meetings in which Relator highlighted this issue, other physicians have echoed Relator's alarm in seeing patients capable of -- or on the road to -- recovery recommended for or sent to hospice.

45.     Relator has consistently refused to participate in Defendants' scheme to put profits over patient care.  In fact, he protested on numerous occasions when Dr. Singh and his physicians pressured him and other specialists to compromise their patients' care.  Relator has also refused to automatically refer his patients to Dr. Singh, instead exercising sound clinical judgment on what is best for each patient based on individual circumstances and needs.  Because of Relator's continued resistance and explicit complaints, Dr. Singh and his physicians have significantly reduced the number of referrals they make to Relator.  Additionally, they have

disparaged Relator within the local medical community, including in communications to Oak Hill management.

46.     Relator first attempted to resolve his concerns about patient harm, particularly Defendants' improper hospice referrals, by approaching Oak Hill's Chief Medical Officer Dr. Edward Nast and Oak Hill's CEO Mickey Smith.  Relator followed this up with a formal complaint in July 2017 to Juan Triana, Access Healthcare's Chief Compliance Officer.  The next day, Access Healthcare VP of Business Development Mirza Baig contacted Relator and instructed him to rescind his complaint, threatening to cut off all referrals to Relator if he failed to comply.  Under pressure, Relator ultimately acquiesced and withdrew his complaint.

47.     Relator, however, continued to challenge Oak Hill's inappropriate hospice referrals even after he was forced to withdraw his formal complaint.  For example, at a September 15, 2017 Department of Surgery meeting, Relator attempted to impose standards for hospice referrals by distributing copies of the ACS National Surgical Quality Improvement Program Risk Calculator, a tool used for identifying surgical patient risk factors, including death. At the same meeting, Relator stressed his ongoing concerns with Access Hospitalists' pattern of unilaterally deciding to withdraw patient support without consulting attending or treating surgeons.  Relator raised similar concerns at a November 17, 2017 Department of Surgery meeting, and at numerous Oak Hill Medical Executive Committee meetings.  Relator also directly challenged Dr. Singh and elevated these issues to other senior Access management.

48.     Not only did Dr. Singh and Access management fail to address Relator's complaints, they engaged in a concerted effort to isolate and discredit him.  That effort included an attempt to strip Relator of hospital privileges at Oak Hill and label him a disruptive physician. On November 22, 2017, Relator received a letter from Ernie Holzhauer, vice chair of Oak Hill's

Board of Trustees, instructing him to "cease and desist making any inappropriate negative comments . . . about Access Health Care, . . . [p]hysicians . . . or hospital personnel." The letter further advised that Relator would be "closely monitored for the next six months." Holzhauer's letter was ostensibly prompted by five separate formal physician complaints. However, these complaints recited strikingly similar language and were lodged nearly simultaneously, suggesting they were part of a concerted effort to stop Relator from speaking out.

## II. Defendants Engage in Prohibited Self-Dealing Through Improper Patient Referrals to Financially Affiliated Entities

49.     In addition to exploiting the Part C payment structure by depriving their patients of necessary medical care, Dr. Singh and the Access Defendants also elevate profit over patient choice and wellbeing through self-dealing related to laboratory, rehabilitation, and diagnostic services. Rather than recommend the facility best suited to a particular patient's medical needs, Dr. Singh and the physicians he controls refer their Medicare patients for these DHS services only to their own financially connected entities.

50.     Dr. Singh is known in Hernando and the surrounding counties for his large network of healthcare business interests, which represent such a large share of the area's health care market that many refer to Spring Hill and the surrounding communities as "Singh Hill." Dr. Singh's network includes Access Laboratories LLC, Brooksville Rehab LLC, Summit Imaging, and several other DHS facilities in which Dr. Singh has a direct or indirect financial interest.

51.     Access PCPs, as gatekeepers of patient care, are responsible for signing DHS referrals even when the underlying request originates from an encounter with a specialist. When an Access PCP refers a patient to a specialist for surgery, the specialist will typically order a variety of healthcare tests and services, including DHS, tailored to the patient's condition and medical needs. For instance, a colon cancer surgical patient will likely need a variety of pre-

surgical tests and services such as a colonoscopy, bloodwork, CT scans, and pre-operative medical and cardiac clearances.  Access' electronic health management systems automatically forward these requests to the patient's PCP to approve each referral.

52.     Dr. Singh and the Access Defendants require their physicians to refer patients in need of such services to DHS facilities in which Dr. Singh or Access have direct or indirect financial relationships.  For example, Dr. Singh requires that any Access patient referrals for diagnostic imaging -- such as X-rays, MRIs, and mammograms -- go to Summit Imaging.  Even when physicians resist using Summit due to quality concerns, Access makes clear that Summit is the only referral option.  Oak Hill radiologist Dr. James Okoh, for example, has repeatedly complained to Relator that he was unable to properly assess Summit imaging results because of their poor quality.  Nevertheless, Dr. Singh and his Access physicians have denied Relator's requests to send surgical patients to imaging facilities other than Summit.

### III.     Relator Reported Defendants' Misconduct to the Government

53.     When his formal internal reporting of these serious threats to patient choice and wellbeing proved fruitless, Relator reported the misconduct to the government.  On September 20, 2017, Relator contacted Seema Verma, Administrator of the Centers for Medicare and Medicaid Services.  Relator reported a "disturbingly high incidence of transfer to hospice or premature withdrawal of support of senior managed care patients."  He further reported that Defendants responded to his complaints with threats and retaliation rather than any legitimate attempt to address this serious wrongdoing.  Relator has since had several in-person interviews and phone conversations with government investigators looking into Relator's complaints of Access misconduct and has provided numerous materials and investigative leads in furtherance of the investigation.

## COUNT I

### Substantive Violations of the Federal False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A)–(C), (a)(1)(G), and 3732(b)

54.     Relator realleges and incorporates by reference the allegations made herein.

55.     This is a claim for treble damages and forfeitures under the Federal False Claims Act, 31 U.S.C. §§ 3279–33, as amended.

56.     Through the acts described above, including on the bases of violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and the Stark Law, 42 U.S.C. § 1395nn, Defendants, their agents, employees, and co-conspirators, knowingly presented, or caused to be presented, to the United States false and fraudulent claims, and knowingly failed to disclose material facts, to obtain payment or approval from the United States and its contractors, grantees, and other recipients of its funds in violation of 31 U.S.C. § 3729(a)(1)(A).  They did so by (i) withholding necessary medical treatment to optimize their Medicare Part C profits; (ii) participating in an illegal kickback scheme under which they condition referrals of Medicare Part C patients to specialists who agreed to withhold necessary medical treatment to maximize Defendants' Part C profits; (iii) transferring ineligible patients to hospice instead of providing them with the medical care they require; and (iv) engaging in self-dealing by requiring their physicians to refer their Medicare patients for DHS services only to their financially connected affiliates.

57.     Through the acts described above, including on the bases of violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and the Stark Law, 42 U.S.C. § 1395nn, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements, which also omitted material facts, to induce the

United States to approve and pay false and fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

58.     Through the acts described above, including on the bases of violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and the Stark Law, 42 U.S.C. § 1395nn, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

59.     Through the acts described above, Defendants, their agents, employees, and co-conspirators conspired with various physicians, competitors, and others to violate 31 U.S.C. §§ 3729(a)(1)(A)–(C) and (G), including on the bases of violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.

60.     The United States, unaware of the falsity of the claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

61.     By reason of the payment made by the United States, as a result of Defendants' fraud, the United States has suffered damages in an amount to be determined at trial.

## COUNT II

### Substantive Violations of the Florida False Claims Act
### Fla. Stat. § 68.082(2)(a), (2)(b), and (2)(g)

62.     Relator realleges and incorporates by reference the allegations made herein.

63.     This is a claim for treble damages and penalties under the Florida False Claims Act, Fla. Stat. §§ 68.081–.092.

64.     Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly presented and caused to be presented to the Florida State Government, including without limitation the Agency for Health Care Administration ("AHCA"), and its officials, false and fraudulent claims, and knowingly failed to disclose material facts, to obtain payment and approval from the Florida State Government.

65.     Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements, which also omitted material facts, to induce the Florida State Government, including without limitation AHCA, to approve and pay false and fraudulent claims.

66.     Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements material to an obligation to pay or transmit money or property to the Florida State Government, and knowingly concealed and knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Florida State Government.

67.     Through the acts described above, Defendants, their agents, employees, and co-conspirators conspired to violate Fla. Stat. §§ 68.082(2)(a)–(c) and (g).

68.     The Florida State Government, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, their agents, employees, and co-conspirators, and as a result thereof, paid money it otherwise would not have paid.

69.     By reason of the payment made by the Florida State Government as a result of Defendants' fraud, the Florida State Government has suffered damages in an amount to be determined at trial.

**PRAYER**

WHEREFORE, *qui tam* plaintiff Dr. Santosh Potdar, M.D. prays for judgment against Defendants as follows:

1.      That Defendants cease and desist from violating 31 U.S.C. §§ 3279–33 and Fla. Stat. §§ 68.081–.092;

2.      That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions in violation of the Federal False Claims Act, as well as the maximum  civil penalty for each violation of 31 U.S.C. § 3729 in accordance with 31 U.S.C. § 3729(a)(1)(G), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461;

3.      That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions in violation of the Florida False Claims Act, as well as the maximum civil penalty for each violation of Fla. Stat. § 68.082(2) in accordance with Fla. Stat. § 68.082(2)(g);

4.      That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act, and Fla. Stat. § 68.085 of the Florida False Claims Act;

5.      That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

6.      That the United States, the State of Florida, and Relator receive all such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

DATED: August 6, 2018                          Respectfully submitted,


Elaine Stromgren
Florida Bar No. 0417610
Jesse L. Hoyer
Florida Bar No. 0076934
Sean Estes
Florida Bar No. 55770
James Hoyer, P.A.
2801 West Busch Boulevard, Suite 200
Tampa, Florida 33618
Tel.: 813-375-3700
Fax.:  813-375-3710
estromgren@jameshoyer.com
jlhoyer@jameshoyer.com
sestes@jameshoyer.com

*Local counsel for Relator*


Gordon Schnell
Phillip Brown
Rosie Dawn Griffin
Hallie Noecker
Constantine Cannon LLP
335 Madison Avenue, Ninth Floor
New York, New York 10017
Tel:  (212) 350-2700

*Counsel for Relator*